Robert B. Sykes (#3180)
Alyson C. McAllister (#9886)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
alyson@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| AMANDA WOOD, daughter, heir and Personal Representative of LINDA NEMELKA, deceased, and ESTATE OF LINDA NEMELKA, by its Personal Representative Amanda Wood; | **AMENDED COMPLAINT & JURY DEMAND** |
| MARJORIE CHARLES-SCOTT, mother, and Personal Representative of SHANDON NICOLE SCOTT, deceased; and ESTATE OF SHANDON NICOLE SCOTT, by its Personal Representative Marjorie Charles-Scott; | |
| CHRIS MILLER and CINDY MILLER on behalf of M.M. (a minor); | Civil No. 2:23-CV-00334-DBB |
| WILFRED ROBLES AND SANDRA CECILIA MOGUEL, Co-Personal Representative of SANDRA FIORELLA ROBLES, deceased; and ESTATE OF SANDRA FIORELLA ROBLES, by its Co-Personal Representatives Wilfred Robles and Sandra Cecilia Moguel; | Judge David Barlow |
| KIMBERLIE DIXON as heir of the ESTATE OF FARRELL BARTSCHI, deceased; | |
| BETHANY SCHMUCKER, CLARENCE NEWMAN, AND ESTATE OF HERMAN SCHMUCKER, deceased; | |
| LAURICE WILLIAMSON, mother, heir and Personal Representative of MORGAN KAY | |

| | |
|---|---|
| HARRIS, deceased; and ESTATE OF MORGAN KAY HARRIS, by its Personal Representative LAURICE WILLIAMSON<br><br>SUSAN ZAWALSKI;<br><br>CHRISTIE MCNICOL;<br><br>JAMIE HINOJOSA;<br><br>          Plaintiffs,<br><br>        vs.<br><br>GOVERNOR SPENCER COX; LT. GOVERNOR DEIDRE HENDERSON; STATE OF UTAH through UTAH DEPARTMENT OF CORRECTIONS (UDC), BRIAN NIELSON (FORMER EXECUTIVE DIRECTOR OF THE UDC), BRIAN REDD (EXECUTIVE DIRECTOR OF UDC), DOE UDC OFFICERS and AGENTS 1-25, UTAH BOARD OF PARDONS & PAROLE (UBPP), MIKE HADDON (DIRECTOR OF UBPP), DOE BOARD MEMBERS 1-10 OF UBPP, DOE UBPP OFFICERS and AGENTS 1-25, UTAH ADULT PROBATION & PAROLE (AP&P), DAN BLANCHARD (FORMER DIVISION DIRECTOR OF AP&P), SCOTT STEPHENSEN (DIVISION DIRECTOR OF AP&P), DOE AP&P OFFICERS and AGENTS 1-25,  and all State Agencies,<br><br>        Defendants. | |

Plaintiffs, by and through their undersigned counsel of record, hereby complain against Defendants as follows:

**PRELIMINARY STATEMENT**

1.      The following allegations are based upon the undersigned's understanding of the information presently available. This is a civil rights action in which the Plaintiffs seek relief for Defendants' violation of their rights guaranteed by the United

States Constitution, specifically the Fourteenth Amendment. These rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. §1983 and §1988. This action also seeks relief under the law, statutes, and Constitution of the State of Utah, specifically Article I, §7.

## JURISDICTION AND VENUE

2.      This action arises under the United States Constitution and federal law, particularly under the provisions of the Fourteenth Amendment to the Constitution of the United States, and 42 U.S.C. §§1983 and 1988.

3.      This action also arises under the Constitution of the State of Utah Article I, §§ 1, 7 and 28.

4.      This action is also based upon liability of governmental entities and/or their employees for "gross negligence" and "willful misconduct" which are not subject to governmental immunity under Utah Code Ann. §§63G-7-201(4)(a); 63G-7-202(3)(c) and (4).

5.      State Courts have the inherent right to adjudicate federal claims, including claims brought under 42 U.S.C. §§1983 and 1988.

6.      Pursuant to Utah Code Ann. 63G-7-502(1), all actions against the State of Utah may be brought in Salt Lake County.

7.      This Court has authority to award costs and attorney fees pursuant to 42 U.S.C. §1988, and pursuant to the Court's inherent power under State law.

## PARTIES

8.     Plaintiff **Amanda Wood** ("Amanda") is a resident of Salt Lake County, State of Utah. Amanda is the daughter of Linda Nemelka ("Nemelka"), deceased. Amanda is an heir of Nemelka and entitled to bring this action under Utah Code Ann. §§78B-3-105 and 106(1).  Amanda was also appointed as a personal representative by this court on June 25, 2020.

9.     Plaintiff **Marjorie Charles-Scott** ("Marjorie") is a resident of Salt Lake County, State of Utah. Marjorie is the mother of Shandon Nicole Scott ("Shandon"), deceased. Marjorie is also an heir of Shandon and entitled to bring this action under Utah Code Ann. §§78B-3-105 and 106(1).

10.     Plaintiff **Chris Miller** ("Chris") is a resident of Salt Lake County, State of Utah, and is the father of M.M., a minor. Plaintiff **Cindy Miller** ("Cindy") is a resident of Salt Lake County, State of Utah, and is the mother of M.M., a minor. As the parents of M.M., Chris and Cindy Miller are entitled to bring this action under Utah law. Plaintiff **M.M.** ("M.M.") is a minor whose parents are Chris and Cindy Miller.

11.     Plaintiff **Wilfredo Robles** ("Wilfredo") is a resident of Salt Lake County, State of Utah. Wilfredo is the father of Sandra Fiorella Robles ("Sandra"), deceased. On September 7, 2022, Wilfredo was also appointed by a Utah state court as the co-personal representative of the Estate of Sandra Fiorella Robles. Wilfredo is an heir of Sandra and entitled to bring this action under Utah Code Ann. §§78B-3-105 and 106(1).

12.    Plaintiff **Sandra Cecilia Moguel** ("Moguel") is a resident of Salt Lake County, State of Utah. Moguel is the mother of Sandra Fiorella Robles, deceased. On September 7, 2022, Moguel was appointed by a Utah state court as the co-personal representative of the Estate of Sandra Fiorella Robles. Moguel is an heir of Sandra and entitled to bring this action under Utah Code Ann. §§78B-3-105 and 106(1).

13.    Plaintiff **Kimberlie Dixon** ("Kimberlie") is a resident of Salt Lake County, State of Utah. Kimberlie is the daughter of Farrell Bartschi ("Farrell"), deceased. Kimberlie is an heir of Farrell and entitled to bring this action under Utah Code Ann. §§78B-3-105 and 106(1).

14.    Plaintiff **Bethany Schmucker** ("Schmucker") is a resident of Davis County, State of Utah. Bethany is the daughter of Herman Schmucker ("Herman"), deceased. Bethany is an heir of Herman and entitled to bring this action under Utah Code Ann. §§78B-3-105 and 106(1). Bethany brings these claims on behalf of herself and her father Herman.

15.    Plaintiff **Clarence Newman** ("Newman") is a resident of Davis County, State of Utah.

16.    Plaintiff **Laurice Williamson** ("Laurice") is a resident of Washington County, State of Utah. Laurice is the mother of Morgan Kay Harris ("Harris"), deceased. On September 21, 2023, Laurice was appointed the personal representative of the Estate of Morgan Kay Harris. Laurice is an heir of Morgan and entitled to bring this action under Utah Code Ann. §§78B-3-105 and 106(1).

17.     Plaintiff **Susan Zawalski** ("Zawalski") is a resident of Salt Lake County, State of Utah.

18.     Plaintiff **Christie McNicol** ("McNicol") is a resident of Salt Lake County, State of Utah.

19.     Plaintiff **Jamie Hinojosa** ("Hinojosa") is a resident of Cache County, State of Utah.

20.     Defendant **State of Utah** is a governmental entity that operates through various Departments, Divisions and Boards as set forth below.

21.     Defendant **Governor Spencer Cox** ("Cox") is the Governor of the State of Utah, and former Lieutenant Governor of the State of Utah (2013-2021). He is sued in his official and individual capacities. Governor Cox oversees all agencies within the executive branch of the government.

22.     Defendant **Lieutenant Governor Deidre Henderson** ("Henderson") is the Lieutenant Governor of the State of Utah. She is sued in her individual and official capacities. Lt. Governor Henderson oversees delegated responsibilities from the Governor to help aid the duty of executing the laws of the State of Utah.

23.     Defendant **Utah Department of Corrections** ("UDC") was at all relevant times herein a Department of the Utah State Government. This Department oversees all State Corrections activities in the State of Utah pursuant to Utah Code Ann. §64-13-1 (et seq).

24.     Defendant **Brian Nielson** is the former Executive Director of UDC and is sued in his official and individual capacities for "willful misconduct" pursuant to Utah Code Ann. §63G-7-202(3)(c).

25.     Defendant **Brian Redd** is the Executive Director of UDC and is sued in his official capacity only for "willful misconduct" pursuant to Utah Code Ann. §63G-7-202(3)(c).

26.     Defendants **Doe UDC Officers and Agents 1-25** were at all relevant times herein officers of UDC, a Department of the State of Utah, operating in the course and scope of their employment, and under the color and guise of the laws of the State of Utah. They are being sued due to their willful misconduct under Utah Code Ann. §63G-7-202(3)(c). The specific identities are presently unknown, but upon positive identification they will be properly served with process, and their individual names will be added to this Complaint in accordance with the applicable State rules.

27.     Defendant **Utah Board of Pardons & Parole** ("UBPP") was at all relevant times herein a Department of the Utah State Government. This Department oversees all Pardon and Parole decision making in the State of Utah pursuant to Utah Code Ann. §77-27-1 (et seq.).

28.     Defendant UBPP's Director, **Mike Haddon**, is sued in his official and individual capacities due to his willful misconduct under Utah Code Ann. §63G-7-202(3)(c).

29.     Defendants UBPP's **Doe Board Members 1-10**, are sued in their official and individual capacities to their willful misconduct under Utah Code Ann. §63G-7-202(3)(c).

30.     Defendants **Doe UBPP Officers and Agents 1-25** were at all relevant times herein officers of UBPP, a Department of the State of Utah, operating in the course and scope of their employment, and under the color and guise of the laws of the State of Utah. They are being sued due to their willful misconduct under Utah Code Ann. §63G-7-202(3)(c). The specific identities are presently unknown, but upon positive identification they will be properly served with process, and their individual names will be added to this Complaint in accordance with the applicable State rules.

31.     Defendant **Utah Adult Probation & Parole** ("AP&P") was at all relevant times herein a Division of UDC, a Department of the Utah State Government. This Division is authorized by statute to supervise parolees who are under the custody and control of the UDC. Utah Code Ann. §64-13-21.

32.     Defendant **Dan Blanchard** is the former Division Director of AP&P and is sued in his official and individual capacities due to willful misconduct under Utah Code Ann. §63G-7-202(3)(c).

33.     Defendant **Scott Stephensen** is the Division Director of AP&P and is sued in his official capacity only due to willful misconduct under Utah Code Ann. §63G-7-202(3)(c).

34.     Defendants **Doe AP&P Officers and Agents 1-25** were at all relevant times herein officers of AP&P, a Department of the State of Utah, operating in the course and scope of their employment, and under the color and guise of the laws of the State of Utah. They are being sued due to their willful misconduct under Utah Code Ann. §63G-7-202(3)(c). The specific identities are presently unknown, but upon positive identification they will be properly served with process, and their individual names will be added to this Complaint in accordance with the applicable State rules.

## GENERAL FACTUAL ALLEGATIONS

35.     The Utah Board of Pardons and Parole ("UBPP") was created to determine when and under what conditions individuals convicted and serving prison sentences in Utah are eligible to be released to probation or parole.

36.     Adult Probation and Parole ("AP&P") is a Division of the Utah Department of Corrections (UDC).

37.     UDC, UBPP, and AP&P are Agencies within the Executive Branch of the Utah State Government.

38.     Defendant UBP's powers are established under Article VII, Section 12 of the Utah Constitution.

39.     This Article is under the Executive Department.

40.     The UBP's authority and responsibilities can also be found in Utah Code Ann. §77-27.

41.     The UBP are members of the panel that decide whether, based on specific guidelines, an individual is eligible for parole.

42.     The members of the UBP are given specific responsibilities and authority in Utah Code Ann. §77-27, and they are not allowed to deviate from those guidelines.

43.     For instance, Utah Code Ann. §77-27-5(1)(c) specifically states: "[t]he board shall prioritize public safety when making determinations under Subsection (1)(a) or (1)(b)

44.      Members of the UBP do not have discretion on what law to follow or how it applies when they "determine by majority when and under what conditions an offender committed to serve a sentence at a . . . correctional facility . . .may be released on parole." Utah Code Ann. §77-27-5(1)(b).

45.     UBP is not a judicial arm of the state.

46.     Governor Spencer Cox ("Cox") is the 18th Governor of the State of Utah and was sworn into office in January 2021.

47.     Prior to his election as Governor of the State of Utah, Cox served as Utah's Lieutenant Governor from 2013-2021.

48.     Cox is charged with overseeing and executing each of the Agencies within the Executive Branch of the Utah State Government.

49.     Cox appointed Nielson, Redd, Blanchard, Stephensen, and Haddon to direct or oversee their particular agencies within the Executive Branch of the Utah State Government.

50.     Cox has known since at least 2016 that UDC, UBPP, and AP&P were not performing their proper duties.

51.     Lieutenant Governor Deidre Henderson ("Henderson") is the 9th Lieutenant Governor of the State of Utah and was sworn into office in January 2021.

52.     Henderson serves directly under Cox and is charged with overseeing and executing law in the Executive Branch of the Utah State Government.

53.     The AP&P Defendants are responsible for properly supervising individuals on probation or parole in accordance with State law and the policies of AP&P.

54.     The AP&P Defendants work closely with the UBPP Defendants in the release and supervision of individuals from State prison.

55.     AP&P officers and agents are POST-trained and certified so that they have special training, qualifications, and certifications as law enforcement officers.

56.     Once an individual is allowed to be released by the UBPP, UDC delegates its supervisory role to AP&P which is required by statute to supervise and monitor the paroled offender. Utah Code Ann. §64-13-21.

57.      On March 31, 2015, former Governor Gary R. Herbert signed House Bill 348 into law.

58.     This bill made changes to sentencing, credit for time served, and parole requirements. It created an earned time credit based on program completions for individuals charged with certain drug and other non-violent crimes. Utah Code. Ann. §64-13-21.

59.     The Justice Reinvestment Initiative ("JRI") was established as a result of, and to implement, House Bill 348.

60.     The JRI mission statement provides:

> The expectation is that JRI will reduce our incarceration and recidivism rates, resulting in savings for taxpayers. The criminal justice system as a whole is expected to move toward ***a system that <u>incarcerates</u> people who pose a <u>risk or a threat</u> to the community*** and ***<u>treats those who</u>*** struggle with addictions but otherwise ***<u>pose little or no danger</u>*** to our neighborhoods.

https://corrections.utah/justice-reinvestment-initiative (emphasis and <u>double</u> emphasis added).

61.     This program was designed to reduce incarceration time for non-violent individuals who pose little risk and who successfully complete approved programs.

62.     This program was designed for *low-risk* offenders who "pose little or no danger" to Utah neighbors and citizens.

63.     This program was **<u>not</u>** designed for *violent* offenders.

64.     In 2016 UBPP was audited by the Utah Legislative Auditor General.

65.     UBPP was given 13 recommended improvements to UBPP's oversight, structure, decision-making, data collection, and business operations.

66.     In 2022, UBPP was audited by the Utah Legislative Auditor General.

67.     UBPP, at the time of the 2022 Audit, had not completed the vast majority of the 13 recommended improvements given by the 2016 Auditor General.

68.     The 2022 Audit found multiple instances where UBPP released violent offenders who did not qualify for release.

69.     The UBPP Defendants were given 15 additional recommended important improvements to UBPP's oversight, structure, decision-making, data collection, and business organization.

70.     The UBPP Defendants' lack of implementation of the recommendations given by the 2016 Auditor General set-in motion the continued release of unqualified, violent individuals on parole.

71.     UBPP knew since at least 2016 that their decision-making and structure was putting the public at risk for violent offenders being released.

72.     The UBPP Defendants knew since at least 2016 that UBPP's lack of structure and organization was leading to the release of violent offenders who did not qualify for parole.

73.     Each of these audits were provided to Defendants Cox, Henderson, Nielson, Blanchard, and Haddon.

74.     Defendants Cox and Henderson knew or reasonably should have known by these audits that UDC, UBPP, and AP&P had serious deficiencies that were leading to the release of violent offenders from prison.

75. Defendants Cox and Henderson recklessly allowed the UDC, UBPP, and AP&P Defendants, under their direction, to continue unsupervised, unchecked and without proper regulation since at least 2011 for Cox and 2021 for Henderson.

76. Defendants Cox and Henderson recklessly allowed the UDC, UBPP, and AP&P Defendants, under their direction, to not implement any of the required and necessary changes to their Agencies.

77. Defendants Cox and Henderson's affirmative actions led to the improper release and non-supervision of violent offenders.

78. Since at least 2016 UBPP has released multiple individuals under the direction of the JRI program who should not have been released because of the "risk or a threat to the community."

79. These individuals were violent offenders who did not qualify for this program, or committed offences for which their parole should have been terminated.

80. The UBPP Defendants knew that allowing these individuals into the JRI program would violate the statute, their own policies and procedures, and the clear intent of the program.

81. The UBPP Defendants knew that these individuals did not qualify for the JRI program.

82. The UBPP Defendants recklessly allowed these individuals to be released to be supervised by AP&P.

83.     The UBPP Defendants committed willful misconduct by allowing unqualified persons with violent histories to be released on parole.

84.     Since at least 2011, AP&P's difficulties in maintaining proper supervision and oversight of paroled offenders under their correctional jurisdiction has been known by State legislative leaders and other public officials.

85.     Since at least 2011, AP&P has known or should have known that it was unable to keep track of paroled offenders under their correctional jurisdiction.

86.     Since at least 2011, AP&P has actively sought to conceal and mislead the public regarding its inability to keep track of paroled offenders as well as its lack of proper supervision over such paroled offenders.

87.     A 2020 legislative audit of the Justice Reinvestment Initiative found that AP&P parole supervision requirements under the statute had only been partially implemented.

88.     The same audit found that offender treatment and supervision were poorly monitored by AP&P.

89.     Further, the audit pointed out that the higher numbers of offenders being released by UBPP into the community under JRI negatively impacted the ability of AP&P officers and agents to supervise offenders, especially violent offenders.

90.     That 2020 audit report also found that the only thing that JRI had done was to release offenders from prison and had not accomplished **any** of the other goals it was created to achieve.

91.     In 2022, the Legislative Auditor General conducted yet another audit on AP&P's performance, oversight, and effectiveness.

92.     This audit again found significant failures by AP&P supervisors to supervise and train officers/agents on the proper methods of supervision of parolees.

93.     Blanchard, as the Director of AP&P at that time, knew or should have known that proper supervision and training was not being done with AP&P Officers/Agents.

94.     As a result of the UBPP Defendants' reckless and improper release of these violent individuals, Plaintiffs have each suffered damages.

95.     The AP&P Defendants committed willful misconduct by failing to supervise these violent individuals who had been recklessly released by UBPP.

96.     As a result of the AP&P Defendants' willful and reckless lack of supervision and unwillingness to implement recommended improvements, Plaintiffs have each suffered damages.

97.     AP&P Doe Officers and Agents concealed this lack of supervision and created false reports which were known by AP&P administration, including Defendants Blanchard and/or Stephensen, to be false.

98.     The purpose of the AP&P Defendants' willful, intentional, and fraudulent concealment of its misconduct in not properly supervising violent offenders was to mislead legislative leaders, public officials, and members of the public to believe that it was fulfilling its responsibilities in monitoring violent offenders.

99.    The willful intentional, and fraudulent misconduct of Defendants includes at least the following:

100.  The AP&P Defendants falsely documented reports relating to the supervision of these violent parolees.

101.  The AP&P Defendants consistently failed to take action to violate the parole of parolees after they had committed new offenses while on parole.

102.  The UBPP, AP&P, and UDC Defendants worked together to allow violent individuals to be released knowing that these offenders would not be supervised.

103.  The AP&P Defendants had a policy requiring Doe Officers and Agents to act more like social workers than law enforcement personnel in dealing with violent offenders.

104.  The AP&P Defendants affirmatively demanded that its officers and agents reduce the enforcement action against parole violators which included, but was not limited to, not accepting violation reports from law enforcement agencies, not reporting violations of parole, not acting to enforce known violations, and not processing arrest warrants to send violating parolees back to jail.

105.  The AP&P Defendants had a policy, procedure, or practice that allowed AP&P Doe Officers and Agents to falsely document personal contact with parolees and falsely document compliance with parole requirements when in fact a violation had occurred.

106.   AP&P Doe Officers and Agents were affirmatively encouraged by the UBPP and AP&P Defendants to falsely document a parolee's full compliance with parole conditions even when AP&P Doe Officers and Agents knew there was not full compliance.

107.   The UBPP Defendants had a policy, procedure, or practice that allowed its members to release violent offenders, who did not qualify for early release.

108.   The UBPP Defendants, AP&P Defendants, and UDC Defendants conspired to have violent offenders released from prison early under the guise of the JRI program.

109.   Defendants' reckless and willful misconduct continued from at least 2016 and was concealed by Defendants in order to keep their actions from going public.

110.   The gross negligence and willful misconduct of Defendants allowed Plaintiffs' loved ones, including children and parents, to be murdered, sexually assaulted, or assaulted by unmonitored or improperly monitored violent offenders who never should have been released or who should have been reincarcerated earlier.

111.   Defendants were aware of the violent assaults, murders, grievous injuries, and sexual assaults by improperly paroled and improperly supervised offenders who did not qualify for parole and allowed such conduct to continue.

112.   This willful and reckless misconduct by Defendants caused many avoidable murders, assaults, and injuries.

113.    Defendants, in each of the cases whose facts are cited below, allowed Brunson, Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen and Coles (hereafter, "these Offenders" or "these violent Offenders") out of prison on early release.

114.    Based on information and belief, Defendants knew or should have known that these Offenders would not be appropriately supervised by AP&P but agreed to allow their release anyway.

115.    Defendants, specifically Cox, Henderson, Nielson, Redd, UDC, UBPP, Haddon, and UBPP Doe Board Members recklessly and with disregard for the safety of Utah citizens, allowed each of these Offenders out of prison without appropriate supervision.

116.    AP&P Doe Officers and Agents regularly and knowingly made only minimal or no contact with each of these Offenders and/or falsified information in their reports so that AP&P administration would believe these Offenders were properly supervised.

117.    Such false information included statements that these Offenders had not violated their parole, when, in fact, known violations had occurred.

118.    Defendants knew or should have known that AP&P officers were not properly supervising each of these Offenders over whom they had statutory authority.

119.    Defendants Cox, Henderson, UDC, Nielson, Redd, AP&P, Blanchard, and Stephensen concealed negative information about the lack of supervision by AP&P

officers and agents after 2016 because they didn't want to be required to go through another legislative audit.

120.    AP&P, Blanchard, and Stephensen did not train officers in the proper supervision of paroled offenders, including Brunson, Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles.

121.    AP&P, Blanchard, and Stephensen created an environment in which officers and agents believed they did not need to properly supervise paroled offenders like these Offenders because they knew they would not suffer any consequences from not doing their jobs.

122.    AP&P, Blanchard, and Stephensen had a duty to train officers in the proper supervision of paroled offenders like these Offenders.

123.    AP&P, Blanchard, and Stephensen had a duty to train officers in the proper methods of obtaining a search warrant.

124.    AP&P, Blanchard, and Stephensen had a duty to train its officers and agents to work closely in tandem with other law enforcement agencies, especially when these law enforcement agencies had information regarding violations of the law by parolees such as these Offenders.

125.    AP&P, Blanchard, and Stephensen had a duty to train officers in the proper methods of supervision and documentation of paroled offenders such as Brunson, Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles.

## FACTUAL ALLEGATIONS RE: WILLFUL MISCONDUCT

126.    Pursuant to Utah Code Ann. §63G-7-102(11), willful misconduct is "the intentional doing of a wrongful act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury."

127.   Under Utah Code Ann. §63G-7-202(3)(c)(i) and (v), there is a waiver of governmental immunity when an employee "acted or failed to act through fraud or willful misconduct." There is a similar waiver of immunity if "the employee intentionally or knowingly … fabricated evidence."

128.  Willfulness "requires a showing (1) that the government actor intentionally performed a wrongful act (2) with the awareness that injury will likely result." Salo v. Tyler, 2018 UT 7, ¶12, 417 P.3d 581.

129.  Based on multiple Legislative Audits, Defendants knew by at least 2011 that UDC, AP&P, and UBPP had significant deficiencies within each of their agencies.

130.  Defendants knew these deficiencies related to the record keeping, monitoring of parolees, and overall management of each agency.

131.   UDC instructed their agents/employees to falsify records about supervision and monitoring of parolees.

132.  UDC created false documentation to cover up their pattern and practice of non-supervision and monitoring of violent parolees.

**133.** AP&P instructed their agents/employees to falsify records about supervision and monitoring of parolees.

**134.** AP&P created false documentation to cover up their pattern and practice of non-supervision and monitoring of violent parolees.

**135.** UBPP instructed their agents/employees to falsify records about the release of violent offenders.

**136.** UBPP created false documentation in order to cover up their release of ineligible violent offenders from prison.

**137.** There was a high risk that these Offenders would likely commit a violent crime based on their past violent criminal behavior.

**138.** AP&P, including the AP&P Defendants, were not properly supervising violent offenders that were being paroled by UBPP.

**139.** UBPP Defendants wrongfully and intentionally failed to act to deny parole release for these individuals, or to terminate parole based on subsequent violations.

**140.** There was no just cause or excuse for UBPP granting parole to these Offenders who the UBPP Defendants knew were violent offenders that would not be properly supervised by AP&P.

**141.** The UDC Defendants and AP&P Defendants wrongfully and intentionally failed to act in fulfilling their statutory responsibilities to properly supervise and oversee these Offenders once they were granted parole by UBPP.

**142.** Defendants Cox and Henderson recklessly allowed UDC, AP&P, and/or UBPP to continue their failed policies and practices, even though they were aware of the horrific consequences of the failed policies and practices.

**143.** AP&P administrative officials knew of and condoned the lack of proper supervision of these Offenders and condoned the false and misleading reporting submitted by AP&P Officers and Agents actions regarding them.

## FACTUAL ALLEGATIONS RE: SPOLIATION OF EVIDENCE

**144.** Based on information and belief, during the implementation of their conspiracy, Defendants Cox, Henderson, UDC, Nielson, AP&P, Blanchard, UBPP, Haddon, and Doe Board Members, either falsified, concealed, and/or destroyed records, reports and notes regarding their improper supervision and oversight of Brunson and Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles.

**145.** Based on information and belief, Defendants Cox, Henderson, UDC, Nielson, AP&P, Blanchard, Doe Officers, UBPP, Haddon, and Doe Board Members, either falsified, concealed, and/or destroyed records, reports and notes for the purpose of hiding their negligence, gross negligence, misconduct, and other unlawful torts.

**146.** The purpose of the falsification, destruction and other similar misconduct was to cover up any evidence of wrongdoing, misconduct, negligence and gross negligence with respect to monitoring these Offenders and other offenders.

**147.** AP&P administration, Blanchard, and Does Officers and Agents knew that Plaintiffs and others had suffered horrible, severe, and even fatal, damages as a result of their lack of proper supervision over these Offenders.

**148.** AP&P administration, Blanchard, and Doe Officers and Agents did not want the public or other government officials to know the details of their lax and unlawful conduct regarding these Offenders because it would be embarrassing to those involved and to political leadership.

**149.** Spoliation of evidence is a criminal offense under Utah Code Ann. §76-8-510.5.

**150.** As a result of the cover-up, Plaintiffs were unaware of the actions of Defendants Cox, Henderson, UDC, Nielson, AP&P, Blanchard, UBPP, Haddon, and Doe Board Members until, in some cases, many months after their loved one's death, sexual assaults, or brutal attacks.

**151.** As a result of the actions of Defendants Cox, Henderson, UDC, Nielson, AP&P, Blanchard, UBPP, Haddon, and Doe Board Members, Plaintiffs suffered severe and unwarranted damages as identified below.

## FACTUAL ALLEGATIONS SPECIFIC TO EACH PLAINTIFF

### Linda Nemelka

**152.** On or about March 10, 2020, Linda Nemelka ("Linda") was shot and killed by James Dekota Brunson ("Brunson") and Anika Celeste Thorpe ("Thorpe").

**153.** UBPP, Haddon, and UBPP Doe Board Members had allowed Brunson and Thorpe out of prison on parole.

**154.** Based on information and belief, UBPP, Haddon, and UBPP Doe Board Members knew that Brunson and Thorpe would not be properly supervised by AP&P but allowed their release anyway.

**155.** Brunson and Thorpe were under the supervision of AP&P at the time of the shooting.

**156.** Linda was in Millcreek, Utah, visiting a friend and having dinner at their home.

**157.** Linda left her friend's house and was sitting in her car, in her friend's driveway, when she was approached by Brunson and Thorpe.

**158.** Brunson and Thorpe intended to carjack Linda.

**159.** Brunson and Thorpe demanded that Linda get out of her car.

**160.** Linda would not exit her car.

**161.** Brunson and/or Thorpe pulled out a gun and shot Linda because she would not comply with their demands.

**162.** Brunson and Thorpe fled the scene.

163.  24 hours earlier Brunson and Thorpe had stolen a car and a gun from an unsuspecting Utah citizen who reported the theft.

164.  Brunson and Thorpe, while on parole, had committed other violations of which law enforcement agencies were aware.

165.  These violations had been reported to AP&P by law enforcement, but AP&P did not attempt to locate Brunson and/or Thorpe to investigate.

166.  The AP&P Defendants knew Brunson and Thorpe were violent offenders and knowingly or recklessly did not properly supervise them.

167.  Plaintiffs incorporate, by reference, ¶¶35-126 herein as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

168.  The actions of these governmental agencies, and their respective officers and agents and employees, demonstrated gross negligence, fraud, fabrication of evidence and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

169.  Because of Defendants' fraudulent concealment and attempts to mislead the public, Plaintiff Amanda Wood was not aware of Defendants' unlawful and improper actions relating to the negligent supervision of Brunson and Thorpe and, as a result, did not have sufficient information to state a claim against Defendants until September 2022.

**170.**  Plaintiff Amanda Wood transmitted her Notice of Claim to the State of Utah on September 27, 2022.

### Shandon Scott

**171.**  On or about May 1, 2021, Shandon Scott ("Shandon") was found in a car on I-80. She had been shot multiple times and left in the passenger seat where she later died. UBPP, Haddon, and UBPP Doe Board Members allowed Terrence Vos ("Vos") out of prison on early release.

**172.**  Based on information and belief, UBPP, Haddon, and UBPP Doe Board Members knew that Vos would not be properly supervised by AP&P but allowed his release anyway.

**173.**  Vos was under the supervision of AP&P at the time of the shooting.

**174.**  Shandon and Vos dated before his incarceration.

**175.**  Before his incarceration, Vos had committed multiple firearms offenses. He had attacked another prisoner at the Utah State Prison. He was known to be violent.

**176.**  Vos was released from the Utah Department of Corrections to be monitored and supervised by AP&P in early 2020.

**177.**  At the time of his release, Vos was placed on an ankle monitor so that AP&P would know his location at all times.

**178.**  AP&P, however, did not use the monitor to check his location or try and make contact with Vos once he was released.

179. After Vos's release he was not properly supervised by AP&P Doe Officers and Agents.

180. Vos was arrested for DUI in late 2020.

181. AP&P knew of the DUI arrest shortly after it occurred.

182. This arrest should have resulted in a parole violation and reincarceration.

183. After the DUI arrest, AP&P Doe officers did not investigate the new charges or make contact with Vos.

184. Vos assaulted Shandon in October of 2020. Shandon reported the assault to authorities, who subsequently reported the violation to AP&P.

185. Vos was never contacted by AP&P.

186. Vos self-reported a police contact to AP&P in November 2020, but AP&P did not investigate it.

187. Vos assaulted Shandon again in November 2020, resulting in her leg being broken in multiple places and requiring surgery.

188. Although the incident was reported to law enforcement and subsequently to AP&P, Vos was never contacted or arrested by AP&P.

189. During periods of his parole, specifically between February 2021 and April 2021, there were outstanding warrants for his arrest of which AP&P was fully aware.

190. AP&P did not investigate or contact Vos concerning these outstanding warrants.

**191.** On May 1, 2021, Vos shot Shandon multiple times and placed her in her car and drove away with her before crashing the car on I-80.

**192.** Shandon died as a result of Vos's actions.

**193.** The AP&P Defendants knew Vos was a violent offender and knowingly did not properly supervise him.

**194.** The AP&P Defendants knew that Vos was violent and had assaulted Shandon multiple times but did not investigate the assaults or violate and reincarcerate him.

**195.** Plaintiffs incorporate, by reference, ¶¶35-126 herein as to Defendants' lack of supervision and training which constituted gross negligence, recklessness and/or willful misconduct.

**196.** The actions of these governmental agencies, and their respective agents and employees, demonstrated gross negligence, fraud, fabrication of evidence, recklessness and/or willful misconduct.  Their actions were intentional, reckless, and/or willful and wanton.

**197.** Because of Defendants' fraudulent concealment and attempts to mislead the public, Plaintiff Marjorie Charles-Scott was not aware of Defendants' unlawful and improper actions relating to the negligent supervision of Vos and, as a result, did not have sufficient information to state a claim against Defendants until September 2022.

**198.** Plaintiff Marjorie Charles-Scott transmitted her Notice of Claim to the State of Utah on September 27, 2022.

## M.M.

**199.** On or about January 27, 2020, M.M. was walking home from school when Creed Lujan ("Lujan") abducted her at knife point.

**200.** UBPP, Haddon, and UBPP Doe Board Members allowed Lujan out of prison on early release in 2016.

**201.** Based on information and belief, UBPP, Haddon, and UBPP Doe Board Members knew that Lujan would not be properly supervised by AP&P but allowed his release anyway.

**202.** After Lujan's release he was not properly supervised by AP&P Doe Officers and Agents.

**203.** Lujan forced M.M. into his car where he duct-taped her hands and feet together and transported her to his house.

**204.** At his home, Lujan forced M.M. to take pills to "relax her," and sexually assaulted her multiple times, photographing and filming the rape.

**205.** Lujan, an AP&P parolee, kidnapped and sexually assaulted M.M.

**206.** Lujan was known to be a violent offender and should have been subject to strict parole and supervision by AP&P.

**207.** At the time of his release, Lujan was placed on an ankle monitor so that AP&P would know his location at all times.

**208.** AP&P, however, did not use the monitor to check his location or try and make contact with Lujan once he was released.

**209.** After Lujan's release he was not properly supervised by AP&P Officers and Agents.

**210.** Lujan's January 27, 2020, assault on M.M. occurred after several parole violations were reported to AP&P.

**211.** The AP&P Defendants knew Lujan was a violent offender and knowingly did not properly supervise him.

**212.** The AP&P Defendants knew that Lujan was violent and had assaulted women multiple times.

**213.** Plaintiffs incorporate, by reference, ¶¶35-126 as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

**214.** The actions of these governmental agencies, and their respective agents and employees, demonstrated gross negligence, fraud, fabrication of evidence, recklessness and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

**215.** Because of Defendants' fraudulent concealment and attempts to mislead the public, Plaintiffs Chris and Cindy Miller were not aware of Defendants' unlawful and improper actions relating to the negligent supervision of Lujan and, as a result, did not have sufficient information to state a claim against Defendants until September 2022.

216.  Plaintiffs Chris and Cindy Miller transmitted their Notice of Claim to the State of Utah on September 27, 2022.

### Sandra Robles

217.  On or about March 26, 2022, Sandra Fiorella Robles ("Sandra") was with Daniel Padilla Ang ("Padilla)" at his basement apartment.

218.  Upon information and belief, Padilla was on probation, supervised by AP&P, and had an AP&P probation officer, because of the prior domestic violence convictions that he had.

219.  Upon information and belief, Padilla was on probation and was required to be supervised by AP&P.

220.  Padilla strangled Sandra to death in the basement of Padilla's mother's home after an argument over a vape pen.

221.  Padilla and Sandra had met at a Beto's restaurant where they worked together in early 2022.

222.  Beto's restaurant manager was never aware of Padilla's AP&P status.

223.  Padilla, as was required under the terms of his probation, never reported to Beto's restaurant manager the facts regarding his AP&P status.

224.  Padilla, contrary to AP&P procedures, was never asked about his employment by the AP&P officers who were supposed to supervise him.

225.  Beto's restaurant manager was never contacted by Padilla's AP&P Officer to check the status of Padilla's employment.

226. Padilla had been a violent offender who should have been subject to strict parole and careful supervision by AP&P.

227. Based upon information and belief, Padilla was placed on an ankle monitor so that AP&P would know his location at all times. AP&P, however, did not use the monitor to check his location or try and make contact with Padilla once he was released.

228. The AP&P Defendants knew Padilla was a violent offender and did not properly supervise him.

229. The AP&P Defendants knew that Padilla was violent and had assaulted women multiple times while on parole.

230. Plaintiffs incorporate, by reference, ¶¶35-126 as to Defendants' lack of supervision and training which constituted gross negligence, fraud, fabrication of evidence, recklessness and/or willful misconduct.

231. The actions of these governmental agencies, and their respective agents and employees, demonstrated gross negligence, fraud, fabrication of evidence, recklessness and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

232. Plaintiffs Wilfred Robles and Sandra Cecilia Moguel transmitted their Notice of Claim to the State of Utah on September 27, 2022.

**Farrell Bartschi**

**233.** On or about October 4, 2021, Farrell Bartschi ("Farrell") was shot and killed while on his morning walk around his neighborhood.

**234.** Every morning around 7:00 a.m. Farrell went for a walk around his neighborhood.

**235.** Noel Munoz Lopez ("Lopez"), an AP&P parolee, murdered Farrell on his morning walk.

**236.** UBPP, Haddon and Doe Board Members allowed Lopez out of prison on early release in February 2021.

**237.** Based on information and belief, UBPP, Haddon and Doe Board Members knew that Lopez would not be properly supervised by AP&P but allowed his release anyway.

**238.** Farrell lived down the street from Lopez's sister.

**239.** Lopez and his sister had an argument the night of October 3, 2021, after which Lopez left.

**240.** The next morning, as Farrell was on his morning walk, Lopez returned to his sister's home with a gun.

**241.** Lopez shot Farrell three times, for no reason, killing him.

**242.** At the time of his release, Lopez was placed on an ankle monitor so that AP&P would know his location at all times. AP&P, however, did not use the monitor to check his location or try and make contact with Lopez once he was released.

243.  After Lopez's release he was not properly supervised by AP&P Officers and Agents.

244.  The AP&P Defendants knew Lopez was a violent offender and knowingly did not properly supervise him.

245.  The AP&P Defendants knew that Lopez was violent and had assaulted multiple individuals many times while on parole.

246.  Plaintiffs incorporate, by reference, ¶¶35-126 as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

247.  The actions of these governmental agencies, and their respective agents and employees, demonstrated fraud, fabrication of evidence, recklessness, gross negligence and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

248.  Plaintiff Kimberlie Dixon transmitted her Notice of Claim to the State of Utah on September 27, 2022.

### Clarence Newman & Bethany Schmucker, for herself and on behalf of the estate and heirs of Herman Schmucker

249.  On or about July 21, 2022, Ammon Jacob Woodhead ("Woodhead") broke into the home of Bethany Schmucker ("Schmucker") and Clarence Newman ("Newman"), in Centerville, Utah. Schmucker's father Herman Schmucker ("Herman") also lived in the home.

250.  UBPP, Haddon, and UBPP Doe Board Members allowed Woodhead out of prison on early release in 2016.

251. Based on information and belief, UBPP UBPP, Haddon, and UBPP Doe Board Members knew that Woodhead would not be properly supervised by AP&P but allowed his release anyway.

252. After Woodhead's release he was not properly supervised by AP&P Doe Officers and Agents.

253. Woodhead seriously assaulted Schmucker and Newman before setting their home on fire.

254. Schmucker was able to call 911.

255. Woodhead then attacked and assaulted Newman.

256. Schmucker was then accosted by Woodhead.

257. Woodhead beat Schmucker so severely she suffered an internal brain bleed, concussion (TBI), broken tooth, and significant eye problems.

258. Woodhead beat Newman causing a concussion, and substantial hearing loss.

259. Herman had to watch his home burn down and had to be placed in a care facility.

260. Herman died on September 15, 2023, as a direct result of the injuries and a rapid decline caused by trauma associated with the attack by Woodhead.

261. At the time of his release, Woodhead was placed on an ankle monitor so that AP&P would know his location at all times.

262.  AP&P, however, did not use the monitor to check his location or try and make contact with Woodhead once he was released.

263.  After Woodhead's release he was not properly supervised by AP&P Officers and Agents.

264.  Woodhead's July 21, 2022, assault and arson of Schmucker, Newman, and Herman occurred after several parole violations were reported to authorities.

265.  The AP&P Defendants knew Woodhead was a violent offender and knowingly did not properly supervise him.

266.  The AP&P Defendants knew that Woodhead was violent and had assaulted individuals multiple times, breaking into their homes.

267.  Plaintiffs incorporate, by reference, ¶¶35-126 as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

268.  The actions of these governmental agencies, and their respective agents and employees, demonstrated gross negligence, fraud, fabrication of evidence, recklessness and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

269. Plaintiffs Bethany Schmucker, Clarence Newman, and Herman Schmucker transmitted their Amended Notice of Claim to the State of Utah on February 22, 2023.

**Morgan Harris**

270.  On or about February 18, 2023, Morgan Kay Harris ("Morgan"), was found dead in a storage unit in Murray, Utah after being murdered by Alex Wardell ("Wardell").

271.  UBPP, Haddon, and UBPP Doe Board Members had allowed Wardell out of prison on parole.

272.  Based on information and belief, UBPP, Haddon, and UBPP Doe Board Members knew that Wardell would not be properly supervised by AP&P but allowed his release anyway.

273.  Wardell was under the supervision of AP&P at the time of the murder.

274.  Wardel, while on parole, had committed other violations of which law enforcement agencies were aware.

275.  These violations had been reported to AP&P by law enforcement, but AP&P did not attempt to locate Wardell to investigate.

276.  The AP&P Defendants knew Wardell was a violent offender and knowingly or recklessly did not properly supervise him.

277.  Plaintiffs incorporate, by reference, ¶¶35-126 herein as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

278.  The actions of these governmental agencies, and their respective officers and agents and employees, demonstrated gross negligence, fraud, fabrication of

evidence and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

**279.** Plaintiff Laurice Williamson transmitted her Notice of Claim to the State of Utah on September 1, 2023.

### Susan Zawalski

**280.** On or about January 18, 2023, Susan Zawalski ("Susan"), was attacked and sexually assaulted in her home in Taylorsville, Utah by Christopher Browning ("Browning").

**281.** UBPP, Haddon, and UBPP Doe Board Members had allowed Browning out of prison on parole.

**282.** Based on information and belief, UBPP, Haddon, and UBPP Doe Board Members knew that Browning would not be properly supervised by AP&P but allowed his release anyway.

**283.** Browning was under the supervision of AP&P at the time of the attack and sexual assault.

**284.** Browning was placed in a halfway house where was not monitored and as a result left without anyone knowing.

**285.** Browning, while on parole, had committed other violations of which law enforcement agencies were aware.

**286.** These violations had been reported to AP&P by law enforcement, but AP&P did not attempt to locate Browning to investigate.

**287.** The AP&P Defendants knew Browning was a violent offender and knowingly or recklessly did not properly supervise him.

**288.** Plaintiffs incorporate, by reference, ¶¶35-126 herein as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

**289.** The actions of these governmental agencies, and their respective officers and agents and employees, demonstrated gross negligence, fraud, fabrication of evidence and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

**290.** Plaintiff Susan Zawalski transmitted her Notice of Claim to the State of Utah on September 1, 2023.

### Christie McNicol

**291.** On or about January 1, 2022, Christie McNicol ("Christie"), was attacked and stabbed at Smith Grocery Store in Salt Lake City, Utah by Thomas Riessen ("Riessen").

**292.** UBPP, Haddon, and UBPP Doe Board Members had allowed Riessen out of prison on parole.

**293.** Based on information and belief, UBPP, Haddon, and UBPP Doe Board Members knew that Riessen would not be properly supervised by AP&P but allowed his release anyway.

**294.** Riessen was under the supervision of AP&P at the time of the attack and sexual assault.

**295.** Reissen had robbed this same Smith's just one week prior to the attack.

**296.** Reissen, while on parole, had committed other violations of which law enforcement agencies were aware.

**297.** These violations had been reported to AP&P by law enforcement, but AP&P did not attempt to locate Reissen to investigate.

**298.** The AP&P Defendants knew Reissen was a violent offender and knowingly or recklessly did not properly supervise him.

**299.** Plaintiffs incorporate, by reference, ¶¶35-126 herein as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

**300.** The actions of these governmental agencies, and their respective officers and agents and employees, demonstrated gross negligence, fraud, fabrication of evidence and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

**301.** Plaintiff Christie McNicol transmitted her Notice of Claim to the State of Utah on December 9, 2022.

**Jamie Hinojosa**

**302.** On or about September 23, 2021, Jamie Hinojosa ("Jamie"), was attacked and shot in Taylorsville, Utah by Brayden Coles ("Coles").

**303.** UBPP, Haddon, and UBPP Doe Board Members had allowed Coles out of prison on parole.

**304.** Based on information and belief, UBPP, Haddon, and UBPP Doe Board Members knew that Coles would not be properly supervised by AP&P but allowed his release anyway.

**305.** Coles was under the supervision of AP&P at the time of the attempted murder.

**306.** Coles, while on parole, had committed other violations of which law enforcement agencies were aware.

**307.** These violations had been reported to AP&P by law enforcement, but AP&P did not attempt to locate Coles to investigate.

**308.** The AP&P Defendants knew Coles was a violent offender and knowingly or recklessly did not properly supervise him.

**309.** Plaintiffs incorporate, by reference, ¶¶35-126 herein as to Defendants' lack of supervision and training which constituted negligence, reckless and willful misconduct.

**310.** The actions of these governmental agencies, and their respective officers and agents and employees, demonstrated gross negligence, fraud, fabrication of

evidence and/or willful misconduct. Their actions were intentional, reckless, and/or willful and wanton.

311.  Because of Defendants' fraudulent concealment and attempts to mislead the public, Plaintiff Jamie Hinojosa were not aware of Defendants' unlawful and improper actions relating to the negligent supervision of Coles and, as a result, did not have sufficient information to state a claim against Defendants until May 2023.

312.  Plaintiff Jamie Hinojosa transmitted her Notice of Claim to the State of Utah on December 1, 2023.

## **FIRST CAUSE OF ACTION**

### *~ State Created Danger ~*

**Against Governor Spencer Cox, Lt. Governor Deidre Henderson, Brian Nielson, Mike Haddon, Dan Blanchard, & All Doe Defendants (in their individual capacities)**

**Cognizable under 42 U.S.C. §1983**

313.  Plaintiffs incorporate by reference all other paragraphs herein.

314.  "Generally, state actors are liable only for their own acts, and not the violent acts of third parties." *Armijo by and through Chavez v. Wagon Mound Public Schools,* 159 F.3d 1253, 1260 (10th Cir. 1998) (quoting *Liebson v. New Mexico Corrections Dep't,* 73 F.3d 274, 276 (10th Cir. 1996)). However, there are two exceptions to this general rule:

> The first exception, known as the ***special relationship doctrine***, "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." The second exception, sometimes referred to as the ***"danger creation" theory***, provides

> that the state may also be liable for an individual's safety "if it created the danger that harmed the individual."

*Armijo,* 159 F.3d at 1260 (emphasis added) (quoting *Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir. 1995) and *DeShaney v. Winnebago Co. Dep't of Social Servs.,* 489 U.S. 189, 199-200 (1989)).

315. A state-created danger applies when "the State creates a dangerous situation for its citizens in the free world or renders them more vulnerable to danger." *Graham v. Indep. Sch. Dist. No. 1-89*, 22 F.3d 991, 995 (10th Cir. 1994).

316. Such a claim requires an allegation of "affirmative acts by the defendants that created or increased the danger to the victims." *Id.*

317. Defendants, including the UBPP Defendants, through willful misconduct, recklessly released or caused the release of violent offenders to community supervision, like these violent Offenders, to-wit, Brunson and Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles. Defendants knew these Offenders were likely to violently reoffend.

318. Defendants, and specifically the UBPP Defendants, released these violent Offenders to community supervision, even though Defendants knew that AP&P, Blanchard, and Doe Officers were not properly supervising violent offenders under its jurisdiction.

319. Defendants' affirmative conduct created a danger of harm and rendered Plaintiffs' loved ones more vulnerable to danger from these Offenders.

**320.** Defendants, and specifically the UBPP Defendants, knew or should have known that their affirmative conduct was likely to result in severe, even fatal, injury to innocent victims, including Plaintiffs and their loved ones.

**321.** Defendants are liable for the danger they created to Plaintiffs by releasing these Offenders from incarceration into the community.

**322.** These UDC and AP&P Defendants affirmatively directed its officers and agents not to actively supervise parolee offenders or enforce violations of their parole.

**323.** As a result, AP&P's Officers and Agents did not properly supervise or monitor these violent Offenders, even after AP&P Officers and Agents had received word from law enforcement of their parole violations and outstanding warrants.

**324.** These UDC and AP&P Defendants failed to take even rudimentary steps to violate the paroles of these Offenders (Brunson and Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles) for clear violations of their parole status.

**325.** Defendants, through their affirmative conduct, led these Offenders to believe they would not be punished for their parole violations.

**326.** Defendants' affirmative conduct, through these UDC and AP&P Defendants, created a danger of harm and rendered Plaintiffs' loved ones more vulnerable to danger from these Offenders.

**327.** Defendants because of the above facts, knew or should have known that their affirmative conduct was likely to result in severe or fatal injury to innocent victims, including Plaintiff's loved ones.

**328.** Defendants are liable for the danger they created to Plaintiffs by not properly supervising these Offenders, including not enforcing the parole violations these UDC and AP&P Defendants knew had been committed by these Offenders.

**329.** As a result of the danger created by Defendants, Plaintiffs suffered severe and unwarranted injuries and damages as identified above, including punitive as allowed by law.

<u>**SECOND CAUSE OF ACTION**</u>

*~ <u>State Created Danger/Special Relationship</u> ~*

*Against Governor Spencer Cox, Lieutenant Governor Deidre Henderson, Utah Department of Corrections, Brian Nielson in his official and individual capacity, Brian Redd, Utah Board of Pardons & Parole, Mike Haddon, Utah Adult Probation & Parole, Dan Blanchard, Scott Stephensen, & All Doe Defendants (in their official and individual capacities)*

**Cognizable under Utah State Statute**

**330.** Plaintiffs incorporate by reference all other paragraphs herein.

**331.** Utah Courts, as a matter of public policy, have said that "governmental actors should be answerable in tort when their negligent conduct causes injury to persons who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor." *Francis v. State Division of Wildlife Resources,* 2013 UT 65, ¶31, 321 P.3d 1029.

**332.** In *Francis,* the Utah Supreme Court recognized four instances where a special relationship would arise:

> (1) by statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; *(2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff*.

*Francis,* at ¶27 (emphasis added).

**333.** Such a claim requires an allegation of "affirmative acts by the defendants that created or increased the danger to the victims." *Id.*

**334.** The Utah Supreme Court explained in *Cope v. Utah Valley State College,* 2014 UT 53 ¶35, 342 P.3d 243, 255, that "active misfeasance is not confined to situations where an affirmative act directly causes harm to the plaintiff but extends to situations where defendants had affirmatively created conditions that gave rise to a duty in order to prevent harm." *Id.*

**335.** Defendants affirmatively created conditions that gave rise to a duty when they were put on notice as early as 2011 that UDC, UBPP, and AP&P were not adequately performing their duties.

**336.** Further, after multiple audits explaining clear deficiencies within each agency, Defendants did not take the necessary steps to correct their actions.

**337.** The continued lack of regulation, record keeping, self-regulation, oversight, training, and supervision affirmatively lead to harm to Plaintiffs.

**338.** Defendants, through willful misconduct, recklessly released or caused the release of violent offenders to community supervision, like these violent Offenders, to-wit, Brunson and Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen and Coles. Defendants knew these Offenders were likely to violently reoffend.

**339.** Defendants, and specifically the UBPP Defendants, released these violent Offenders to community supervision, even though Defendants knew that AP&P was not properly supervising violent offenders under its jurisdiction.

**340.** Defendants' affirmative conduct created a danger of harm and rendered Plaintiffs' loved ones more vulnerable to danger from these Offenders.

**341.** Defendants, especially the UBPP Defendants, knew or should have known that their affirmative conduct was likely to result in severe, even fatal, injury to innocent victims, including Plaintiffs and their loved ones.

**342.** Defendants are liable for the danger they created to Plaintiffs by releasing these Offenders from incarceration into the community.

**343.** Defendants, through AP&P, a division of UBPP, affirmatively directed its officers and agents not to actively supervise parolee offenders or enforce violations of their parole.

**344.** As a result, AP&P's Officers and Agents did not properly supervise or monitor these violent Offenders, even after AP&P Officers and Agents had received word from law enforcement of their parole violations and outstanding warrants.

345.  AP&P, acting for these Defendants, failed to take even rudimentary steps to violate the paroles of these Offenders (Brunson and Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles) for clear violations of their parole status.

346.  Defendants, through AP&P's affirmative conduct, led these Offenders to believe they would not be punished for their parole violations.

347.  Defendants' affirmative conduct, through AP&P, created a danger of harm and rendered Plaintiffs' loved ones more vulnerable to danger from these Offenders.

348.  AP&P, acting for Defendants, because of the above facts, knew or should have known that their affirmative conduct was likely to result in severe or fatal injury to innocent victims, including Plaintiff's loved ones.

349.  Defendants, through the actions of AP&P, are liable for the danger they created to Plaintiffs by not properly supervising these Offenders, including not enforcing the parole violations AP&P knew had been committed by these Offenders.

350.  As a result of the danger created by Defendants, Plaintiffs suffered severe and unwarranted injuries and damages as identified above, including punitive damages as allowed by law.

### **THIRD CAUSE OF ACTION**

#### *~ Negligence & Gross Negligence ~*

**Against All Defendants (including All Doe Defendants),
in their official and individual capacities**

351.  Plaintiffs incorporate by reference all other paragraphs herein.

352.   To establish a claim of negligence, a party must establish four essential elements: "(1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." *Gonzalez v. Russell Sorensen Const.*, 2012 UT App 154, ¶20, 279 P.3d 422.

353.   Gross negligence is defined as "the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result." *Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶35, 423 P.3d 1150.

354.   In *Cunningham v. Weber Co.,* 2022 UT 8, 506 P.3d 575, the plaintiff argued that the Governmental Immunity Act (GIA) waived governmental immunity for gross negligence under Utah Code Ann. §63G-7-301(2)(i). The Utah Supreme Court held that section "waives immunity for both simple and gross negligence."

355.   Defendants owed each Plaintiff a duty to carefully review and deny or revoke parole for known violent offenders like Brunson, Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles (these Offenders) who, because of their past actions both in and out of incarceration, should not have been eligible for parole.

356.   Defendants, especially the UBPP Defendants, knew or should have known that there was a very high probability, based on past actions and violations, that these Offenders would violate their parole.

**357.** Based on the 2016 legislative audit, the UBPP Defendants knew or should have known that the AP&P Defendants were not properly supervising or monitoring parolee offenders, like these violent Offenders, as required.

**358.** The UBPP Defendants breached their duty when, knowing the relevant facts as set forth above, it nevertheless approved these violent Offenders for release to community supervision under AP&P.

**359.** Defendants' breach of their duties was the proximate cause of the injuries and damages to Plaintiffs. This includes the deaths of their family members in the Nemelka, Scott, Bartschi, Schmucker, and Williamson cases, the kidnapping and sexual assault of M.M., and the assaults of the other Plaintiffs, as well as the attendant pain and suffering which accompanied the violent, heinous, and outrageous acts of these Offenders.

**360.** All Plaintiffs suffered severe and unwarranted injuries and damages, as set forth above.

**361.** The UDC and AP&P Defendants owed each Plaintiff a duty to supervise, oversee and report on these violent Offenders who had been paroled by UBPP.

**362.** The UDC and AP&P Defendants breached that duty when, knowing that these Offenders were violent and had violated parole restrictions in the past, they knowingly and purposefully failed to properly supervise these Offenders.

**363.** The UDC and AP&P Defendants knew that these Offenders had violated the restrictions of their parole, yet they did nothing to enforce the penalties for such violations.

**364.** The AP&P Doe Officers and Agents, by not enforcing their own rules and regulations requiring penalties for violations, condoned and encouraged the continued bad behavior of these Offenders by allowing them to believe they would not be violated for their actions and re-incarcerated.

**365.** Defendants' breaches of these duties were the proximate cause of the deaths, injuries and damages to Plaintiffs as described herein, as well as the attendant pain and suffering which accompanied the violent, heinous and outrageous acts of these Offenders.

**366.** Plaintiffs did, in fact, suffer severe and unwarranted injuries and damages, as set forth herein.

**367.** Defendants were negligent and grossly negligent in their duties to Plaintiffs because knowing that these Offenders were each violent offenders who had previously committed crimes after release from incarceration, they failed to observe even slight care in allowing these individuals to be released again.

**368.** This was especially egregious and outrageous when Defendants, especially, UBPP Defendants, knew or should have known that AP&P was not properly supervising the violent offenders which it was releasing to its jurisdiction.

**369.** The UBPP and AP&P Defendants demonstrated carelessness and recklessness to a degree that shows utter indifference regarding the serious consequences which it knew might actually result to Plaintiffs from its decisions and actions.

**370.** The AP&P Defendants were grossly negligent in their duties to Plaintiffs when AP&P Doe Officers and Agents failed to observe even slight care to properly supervise these violent Offenders and did not enforce penalties for violation of restrictions.

**371.** The AP&P Defendants demonstrated carelessness and recklessness to a degree that shows utter indifference to the Plaintiffs regarding the serious consequences which it knew might result from its decisions and actions.

**372.** All UBPP and AP&P Defendants were grossly negligent in their duties to Plaintiffs.

**373.** The egregious actions of negligence and gross negligence of Defendants waive governmental immunity under the Government Immunity Act, Utah Code Ann. §63G-7-301(2)(i).

**374.** The actions of Defendants as outlined above caused the injuries and damages described herein, and punitive damages as allowed by law.

## FOURTH CAUSE OF ACTION

### ~ *Civil Conspiracy* ~

**Against All Defendants in their Official and Individual Capacities**

**375.** Plaintiffs incorporate by reference all other paragraphs herein.

**376.** A claim of civil conspiracy requires "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or

course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Kirkham v. Widdison*, 2019 UT App 97, ¶35, 447 P.3d 89.

**377.** Defendants failed to properly supervise and oversee these violent Offenders.

**378.** Defendants, particularly Cox, Henderson, Nielson and/or Redd, Blanchard and/or Stephensen, Haddon, and UBPP Doe Board Members, were aware or reasonably should have been aware of the deficiencies within their agencies and concealed that information from the public.

**379.** Defendants agreed or acquiesced enough that together that they would not properly supervise or oversee these violent Offenders because they did not want to do the extra work required to manage such violent offenders and because they had been told by AP&P administration to not actively enforce parole violations against parolee offenders.

**380.** The AP&P Defendants and Blanchard had a meeting of the minds in pursuing the object of their conspiracy knowing that they were committing unlawful acts of negligence, gross negligence, and willful misconduct.

**381.** Defendants, particularly Cox, Henderson, Nielson and/or Redd, Blanchard and/or Stephensen, Haddon, and UBPP Doe Board Members, had a meeting of the minds in pursing the object of their conspiracy knowing that they were committing unlawful acts by misleading the public about the policies and practices in their agencies or completely ignoring their legal obligations.

382.  Because AP&P Doe Officers and Agents, did not properly supervise, as was agreed amongst Defendants, Brunson and Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles were allowed to violate their parole restrictions without consequence, to acquire firearms and drugs, to assault innocents and ultimately to murder Nemelka, Scott, Bartschi, and Harris as well as to kidnap and sexually assault M.M. and Zawalski.

383.  Defendants, especially the AP&P Defendants and Blanchard, knew or should have known about the conspiracy among its officers and agents and did nothing to correct the situation. This exacerbated the already potentially deadly effects of the conspiracy.

384.  Plaintiffs suffered severe and unwarranted injuries and damages as a result of the conspiracy by as identified in the First, Second, Third and Fourth Causes of Action.

## FIFTH CAUSE OF ACTION

### ~ *Failure to Train and/or Supervise* ~

**Against All Defendants in their Official and Individual Capacities**

**Cognizable under 42 U.S.C. §1983**

385.  Plaintiffs incorporate by reference all other allegations herein.

386.  To state a claim against Defendants Cox, Henderson, UDC, Nielson, Redd, AP&P, Blanchard, Stephensen, UBPP, Haddon, and UBPP Doe Board Members, for failure to train its officers and agents, Plaintiffs must demonstrate these Defendants,

acted with "deliberate indifference as to [the] known or obvious consequences" of those actions. *Waller v. City and County of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019).

387. To state such a claim, Plaintiffs must demonstrate supervisory deficiencies or inadequacies by these Defendants and show that those damages were caused by such deficiencies or inadequacies. *Waller*, 932 F.3d at 1288-89.

388. These Defendants were all aware and reasonably should have been aware of problems with AP&P supervisory policies and practices as early as 2016. Henderson should have known since at least 2021.

389. The AP&P Defendants and Blanchard instructed its officers and agents to reduce enforcement of parole violations and to cut back on issuing warrants for a parolee's arrest even though such parolees had violated parole.

390. This policy or practice was inconsistent with the requirements of AP&P and was directly contrary to what AP&P was telling the public: that paroled offenders were being carefully supervised and that the public was safe.

391. The AP&P Defendants and Blanchard knew that what it was reporting to the public was not true.

392. Defendants Cox, Henderson, UDC, Nielson, Redd, AP&P, Blanchard, Stephensen, UBPP, Haddon, and UBPP Doe Board Members, knew that what AP&P and Blanchard were reporting to the public was not true.

**393.** AP&P Officers and Agents followed the policy or practice and directions they had been given by Blanchard and the AP&P Defendants and failed to properly supervise these violent Offenders.

**394.** The AP&P Defendants and Blanchard were acutely aware of the violent nature of these Offenders and that they could easily commit horrible crimes with only minimal external stimulus.

**395.** The AP&P Defendants and Blanchard knew that these Offenders had already committed multiple parole violations but did nothing to enforce its own rules because of the policies and training practiced by AP&P administration and Blanchard.

**396.** Defendants Cox, Henderson, UDC, Nielson, Redd, AP&P, Blanchard, Stephensen, UBPP, Haddon, and UBPP Doe Board Members, and its officers and agents were deliberately indifferent to the known or obvious consequences of their insufficient and inadequate policies, practices and training.

**397.** The AP&P Defendants and Blanchard's deliberate indifference in overseeing the supervision of these violent Offenders and enforcing parole violations was the proximate cause of the unnecessary deaths of Nemelka, Scott, Bartschi, Herman, and Harris, the brutal kidnapping and sexual assault of M.M., and Zawalski, and the vicious assaults on the other Plaintiffs.

**398.** AP&P's policies and practices created an environment among the AP&P Doe Officers and Agents that condoned minimal or no supervision of paroled

violent Offenders like Brunson and Thorpe, Vos, Lujan, Padilla, Lopez, Woodhead, Wardell, Browning, Reisen, and Coles.

**399.** Defendants Cox, Henderson, UDC, Nielson, Redd, AP&P, Blanchard, Stephensen, UBPP, Haddon, and UBPP Doe Board Members, knew from outside audits and internal statistical data that AP&P's supervisory policies and practices were deficient and inadequate, yet it deliberately did nothing.

**400.** The AP&P Defendants and Blanchard's inadequate supervision of its Officers and Agents, as described herein, was the proximate cause of the deaths of Nemelka, Scott, Bartschi, Herman, and Harris, the kidnapping and sexual assault of M.M., and Zawalski, and the violent assaults on the other Plaintiffs as described herein.

**401.** Plaintiffs suffered severe and unwarranted damages as a result of the conspiracy by AP&P officers and agents as identified in the First, Second, Third, and Fourth Causes of Action.

### SIXTH CAUSE OF ACTION

#### ~ *Unlawful or Deficient, Policies Procedures and/or Protocols*~

*Against State of Utah, Cox, Henderson, Utah Department of Corrections, Nielson, Redd, Utah Adult Probation & Parole, Blanchard, Stephensen, Utah Board of Pardons & Parole, Haddon, and All Doe Defendants (in their official and individual capacities)*

**402.** Plaintiffs incorporate by reference all other allegations herein.

**403.** Defendants Cox and Henderson had a duty to properly enforce policies and procedures within each of the executive agencies of the Utah State government including UDC, AP&P, and UBPP.

**404.** The UBPP Defendants had a duty to properly screen and release parolees to UDC, under the supervision of Nielson and/or Redd, and AP&P, under the supervision of Blanchard and/or Stephensen.

**405.** UDC, under the supervision of Nielson and/or Redd, and AP&P, under the supervision of Blanchard and/or Stephensen, had a duty to properly supervise and monitor parolee offenders once they had been released from incarceration by UBPP.

**406.** This duty is not a discretionary function. *Kerr v. City of Salt Lake,* 2013 UT 75, ¶14, 322 P.3d 669 ("discretionary function exception allows the government to retain immunity for high-level policy decisions regulated by the political process" (punctuation omitted)).

**407.** Defendants Cox and Henderson breached their duty when they did not properly supervise the UDC, AP&P, and UBPP Defendants, after multiple audits exposed significant deficiencies within each agency.

**408.** UDC, under the supervision of Nielson and/or Redd, and AP&P, under the supervision of Blanchard and/or Stephensen, as alleged herein, breached their duty when they did not properly supervise Doe Officers and Agents in their responsibilities to properly supervise these Offenders.

**409.** The UBPP Defendants breached their duty when they did not properly screen violent offenders and allowed for their release to the public.

**410.** UDC, under the supervision of Nielson and/or Redd, and AP&P, under the supervision of Blanchard and/or Stephensen, knew or should have known that Doe

Officers and Agents did not monitor and/or perform the required statutory checks on these Offenders.

411.  UDC, under the supervision of Nielson and/or Redd, and AP&P, under the supervision of Blanchard and/or Stephensen, allowed Doe Officers and Agents to not monitor and/or not perform the required checks on these Offenders.

412.  Defendant Cox and Henderson's policies and practices allowed or tolerated non-enforcement of regulation of UDC, AP&P, and UBPP even after they were aware of over a dozen deficiencies within each agency.

413.  By these actions, Defendants Cox and Henderson condoned the improper and unlawful actions, gross negligence and willful misconduct of the UDC, AP&P, and UBPP Defendants.

414.  The UBPP Defendants policies and procedures allowed or tolerated non-enforcement of regulations or creation of regulations to aid in their decisions to release offenders from prison.

415.  By these actions, the UBPP Defendants condoned improper and unlawful actions, gross negligence and willful misconduct within their agency.

416.  Policies and practices of the UDC and AP&P Defendants allowed or tolerated non-enforcement of regulations by Doe Officers and Agents even after they were aware of various crimes and misconduct, including DUI charges, parole violations and outstanding warrants against these Offenders.

417.  The UDC and AP&P Defendants did not discipline Doe Officers and Agents for their lack of proper supervision and enforcement of AP&P regulations.

418.  By these actions, the UDC and AP&P Defendants condoned the improper and unlawful actions, negligence and willful misconduct of the Doe Officers and Agents.

419.  The lack of proper supervision by the UDC and AP&P Defendants was the proximate cause of the severe and unnecessary injuries suffered by Plaintiffs and their loved ones as set forth above.

420.  The actions of these Defendants as described above caused the injuries and damages to Plaintiffs as described and reported herein. This includes but is not limited to loss of loved ones who were killed, physical injuries to those who were raped and assaulted, and significant general and punitive damages for all of the Plaintiffs.

## SEVENTH CAUSE OF ACTION

### ~ *Wrongful Death* ~

**Against All Defendants in their Official and Individual Capacities**

421.  Plaintiffs incorporate by reference all other allegations herein.

422.  Utah Code Ann. §78B-3-106 states that "when the death of a person is caused by the wrongful act or neglect of another, his heirs ... may maintain an action for damages."

**423.** The UBPP Defendants allowed Brunson, Thorpe, Vos, Padilla, Lopez, Woodhead, and Wardell to be paroled and released from prison knowing that UDC and AP&P were not properly supervising paroled offenders under its jurisdiction.

**424.** Linda Nemelka's life was wrongfully taken on March 10, 2020, as a result of the wrongful acts, negligence, gross negligence and willful misconduct of the UDC and AP&P Defendants in not properly supervising Brunson and Thorpe.

**425.** Shandon Scott's life was wrongfully taken on May 1, 2021, as a result of the wrongful acts, negligence, gross negligence and willful misconduct of the UDC and AP&P Defendants in not properly supervising Terence Vos.

**426.** Sandra Robles' life was wrongfully taken on March 26, 2022, as a result of the wrongful acts, negligence, gross negligence and willful misconduct of the AP&P Defendants in not properly supervising Daniel Padilla.

**427.** Farrell Bartschi's life was wrongfully taken on October 4, 2021, as a result of the wrongful acts, negligence, gross negligence and willful misconduct of the UDC and AP&P Defendants in not properly supervising Noel Lopez.

**428.** Herman Schmucker's life was wrongfully taken on September 15, 2023, as a direct result of the wrongful acts, negligence, gross negligence and willful misconduct of the UDC and AP&P Defendants in not properly monitoring Ammon Jacob Woodhead.

**429.** Morgan Harris's life was wrongfully taken on February 18, 2023, as a result of the wrongful acts, negligence, gross negligence and willful misconduct of the UDC and AP&P Defendants not properly supervising Alex Wardell.

**430.** Brunson, Thorpe, Vos, Padilla, Lopez, Woodhead, and Wardell were each under the jurisdiction of the UDC and AP&P Defendants, having been placed on parole by the UBPP Defendants.

**431.** Brunson, Thorpe, Vos, Padilla, Lopez, Woodhead, and Wardell were violent offenders who had violated their parole after being released by Defendants.

**432.** The UDC and AP&P Defendants knew or should have known that these six Offenders had violated their parole.

**433.** The UDC and AP&P Defendants failed to supervise these six Offenders and violate their parole and place them back to in-custody confinement.

**434.** The UDC and AP&P Defendants failed to coordinate with law enforcement to investigate and enforce outstanding charges and/or warrants for these particular Offenders.

**435.** Even though this information was known by the UDC and AP&P Defendants, Doe Officers and Agents deliberately and intentionally did not properly supervise Brunson, Thorpe, Vos, Padilla, Lopez, Woodhead and Wardell and then falsified reporting and paperwork to cover up the mistakes and failures of AP&P and the UDC.

**436.** Defendants Cox and Henderson failed to supervise UDC, UBPP, AP&P and their leaders, even though they knew about the improper and deficient actions detailed in this Complaint. The actions of Cox and Henderson were therefore "wrongful" and therefore caused the injuries and deaths of the Plaintiffs as detailed herein.

**437.** These actions constituted "wrongful acts and neglect of another" which led to the deaths of Nemelka, Scott, Bartschi, Herman, and Harris.

## EIGHTH CAUSE OF ACTION

### ~ *Violation of Utah State Constitution* ~

### *Against All Defendants in their Official and Individual Capacities*

**438.** Plaintiffs incorporate by reference all other allegations herein.

**439.** All Defendants have violated the Plaintiffs' State Constitutional rights as set forth in this Complaint.

**440.** Article I of the Utah Constitution provides protection of basic rights for its citizens.

**441.** Article I, Section 1 of the Utah Constitution provides that "All persons have the inherent and inalienable right to enjoy … their lives and liberties."

**442.** The Utah Constitution, Article I, Section 7 states:

No person shall be deprived of life, liberty, or property without due process of law.

**443.** The Utah Constitution, Article I, Section 28, provides that "victims of crimes have these rights … to be free from … abuse throughout the criminal justice process."

444.  As a direct and proximate result of Defendants' flagrant violations of these rights, Plaintiffs have sustained egregious injuries up to and including death, as set forth above.

445.  No other remedy for Plaintiffs' unconstitutional injuries exists.

446.  Plaintiffs are entitled to damages and attorney's fees as set forth herein. The conduct of Defendants warrants the imposition of punitive damages as may be allowed by law.

## JURY DEMAND

Plaintiffs demand a Jury Trial on all Causes of Action included herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Defendants as follows:

1.     For general and compensatory damages for each Plaintiff in an amount to be determined at trial;

2.     For special damages as are shown at trial and as may be allowed by law;

3.     For punitive damages against each Defendant as may be allowed by law and as are shown at trial;

4.     For pre-judgment interest on the damages assessed by the Court, as allowed by law;

**5.**     For Plaintiffs' costs and reasonable attorney fees incurred herein, pursuant to 42 U.S.C. 1988; and as otherwise may be allowed by Utah State or federal law; and,

**6.**     For such other and further damages and relief as is appropriate and permissible and as the Court deems just and proper, including relief for spoliation of evidence to the full extent allowed.

DATED this 15th day of February, 2024.

**SYKES McALLISTER LAW OFFICES, PLLC**

*/s/ Alyson C. McAllister*
ROBERT B. SYKES
ALYSON C. MCALLISTER
C. PETER SORENSEN
CHRISTINA D. ISOM
*Attorneys for Plaintiffs*